IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States District Court
Southern District of Texas

**ENTERED**

August 08, 2017

David J. Bradley, Clerk

JAMES SPANGLER,                      §
                                     §
        Plaintiff,                   §
                                     §
v.                                   §   CIVIL ACTION NO. H-16-0349
                                     §
MOURIK, L.P.,                        §
                                     §
        Defendant.                   §

## MEMORANDUM OPINION AND ORDER

Plaintiff, James Spangler ("Spangler"), filed this action against defendant, Mourik, L.P. ("Mourik"), to recover unpaid overtime wages and statutory damages under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b) for willfully misclassifying him as exempt from overtime. Pending before the court is Defendant's First Amended Motion for Complete Summary Judgment ("Defendant's FAMSJ," Docket Entry No. 19), and Plaintiff's Response to Motion for Summary Judgment and Cross-Motion for Partial Summary Judgment ("Plaintiff's Response and CMPSJ," Docket Entry Nos. 23 and 24). After considering Plaintiff's Supplemental Response to Motion for Summary Judgment ("Plaintiff's Supplemental Response," Docket Entry No. 25), Defendants's Reply in Support of Its Motion for Complete Summary Judgment ("Defendant's Reply," Docket Entry No. 26), Defendant's Response in Opposition to Plaintiff's Cross-Motion for Partial Summary Judgment ("Defendant's Response," Docket Entry No. 27), Plaintiff's Reply in Support of Cross-Motion for Partial Summary Judgment ("Plaintiff's Reply," Docket Entry No. 28), and the applicable law, the court concludes that the pending motions for summary judgment should both be denied.

## I. **Standard of Review**

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment. Fed. R. Civ. P. 56(a). Disputes about material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2511 (1986). The Supreme Court has interpreted the plain language of Rule 56(a) to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not *negate* the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)(per curiam). If the moving party meets this burden, the nonmovant must go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. Id. Factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." Id.

## II.  **Undisputed Facts**

Mourik is an industrial cleaning, environmental remediation, and industrial maintenance company that provides an array of services to the chemical and petrochemical industries, including factory turnarounds, high pressure and industrial vacuum cleaning, remediation of chemical storage tanks, waste container maintenance and cleaning, plant shutdowns, asbestos clean-up, and cleaning and maintenance in inert and toxic atmospheres.[1]

On January 21, 2013, Mourik hired Spangler to work as a Project Supervisor for an annual salary of $57,500.00 plus incentive bonuses ranging from $10,000.00 to $15,000.000 per year; Spangler's employment as a Mourik Project Supervisor ended in November of 2015 when he was earning $65,000.000 per year plus incentive bonuses.[2]  As a Project Supervisor Spangler managed a team of three to thirty employees providing refinery turnaround and industrial cleaning/vacuuming services.[3]  Spangler held a Commercial Drivers License ("CDL"), and could drive vehicles in

---

[1]Defendant's FAMSJ, Docket Entry No. 19, p. 7 (citing Declaration of Melissa Barner ("Barner Declaration"), Docket Entry No. 19-1, p. 2 ¶3.

[2]Id. (citing Barner Declaration, Docket Entry No. 19-1, p. 2 ¶5; and Oral Deposition of James Spangler ("Spangler Deposition"), pp. 41:1-3, 48:17-22, 51:20-52:3, 67:19-68:8, 140:17-24, Docket Entry No. 19-2, pp. 14, 15, and 37).

[3]Id. at 8 (citing Barner Declaration, Docket Entry No. 19-1, pp. 2-3 ¶¶7 and 9; Spangler Deposition, pp. 74:1-76:14, Docket Entry No. 19-2, p. 21).

excess of 10,000 pounds to jobsites in different states.[4]  Spangler
would start a typical day by meeting with the client before his
shift to discuss planned tasks.  Spangler would then meet with his
crew to discuss tasks to be completed during their shift, assign
personnel to various tasks, and ensure that the crew members
understood their responsibilities.[5]  The crew members wore video
cameras so that once work began, Spangler could sit with the client
in his truck or in a trailer and monitor the video feed on his
computer.  Spangler used his observations to direct the crew
through the shift, allocate resources to accomplish project goals,
and keep time sheets.  Spangler reported to a project manager.[6]

Once a project was completed, Spangler would work out of
Mourik's office until the next project started.  Spangler's post-
project duties included writing a report summarizing Mourik's
performance, completing performance reviews for his crew members,
and preparing proposals for new projects.[7]

---

[4]Id. (citing Barner Declaration, Docket Entry No. 19-1, p. 4
¶8, and Spangler Deposition, pp. 57:15-58:8, Docket Entry No. 19-2,
pp. 16-17).

[5]Id. at 9 (citing Barner Declaration, Docket Entry No. 19-1,
pp. 4-5 ¶10, and Spangler Deposition, pp. 88:20-89:3, 90:9-22,
Docket Entry No. 19-2, pp. 24-25).

[6]Id. at 9-10 ((citing Barner Declaration, Docket Entry No. 19-
1, p. 5 ¶11, and Spangler Deposition, pp. 88:4-6, 94:12-97:18,
Docket Entry No. 19-2, pp. 24 and 26).

[7]Id. at 10 ((citing Barner Declaration, Docket Entry No. 19-1,
p. 5 ¶13, and Spangler Deposition, pp. 84:7-11, 99:14-100:23,
(continued...)

### III.  **Analysis**

Alleging that Mourik wrongfully misclassified him as exempt and failed to pay him overtime when he worked more that 40 hours in a workweek, Spangler asserts claims under 29 U.S.C. § 216(b) for unpaid overtime and statutory damages.[8]  Mourik argues that it is entitled to complete summary judgment on plaintiff's FLSA claim because Spangler was properly classified as exempt from the FLSA's overtime provisions pursuant to the executive, administrative, combination, and/or motor carrier exemptions, and because Mourik acted in good faith such that any FLSA violation was not willful.[9] Spangler responds by arguing that Mourik is not entitled to summary judgment on his FLSA claim because the alleged exemptions do not apply to him, and by filing a cross-motion for partial summary judgment on the four exemptions asserted by Mourik.[10]  Spangler admits, however, that Mourik did not act willfully for purposes of extending the statute of limitations from two to three years under 29 U.S.C. § 255(a), but argues that Mourik did act willfully for purposes of liquidated damages.[11]  Mourik replies that Spangler's

---

[7](...continued)
104:4-105:14, Docket Entry No. 19-2, pp. 23, 27, 28).

[8]Complaint, Docket Entry No. 1.

[9]Defendant's FAMSJ, Docket Entry No. 19.

[10]Plaintiff's Response and CMPSJ, Docket Entry Nos. 23 and 24, pp. 4-5.

[11]Id. at 20 ("Mourik [i]s [c]orrect on [w]illfulness for
(continued...)

motion for partial summary judgment should be denied as untimely and without good cause.[12] Alternatively, Mourik argues that genuine issues of material fact for trial preclude granting the motion.[13]

**A.   Plaintiff's Motion for Partial Summary Judgment is Untimely and Without Good Cause.**

Mourik moved for summary judgment on Spangler's FLSA claims on April 26, 2017.[14]  Mourik's motion for summary judgment was timely filed because on December 2, 2016, the court signed the Proposed Order Granting Joint Motion to Extend Deadlines (Docket Entry No. 13), requiring the parties to mediate by February 24, 2017, stating "[d]ispositive motions will be due thirty days after the mediator or magistrate judge declares an impasse," and setting the dates for filing the joint pretrial order and for holding docket call as June 2, 2017, and June 9, 2017, respectively.  On March 30, 2017, the mediator filed an ADR Memorandum to Clerk of Court Report of Appointment and Fees (Docket Entry No. 15), stating: "The case referred to ADR did not settle."   Mourik's motion for summary judgment was timely filed because it was filed less than thirty days after the mediator declared an impasse.

---

[11](...continued)
[l]imitations [p]urposes.").

[12]Defendant's Response, Docket Entry No. 27, pp. 5-6.

[13]Id. at 6.

[14]Defendant's FAMSJ, Docket Entry No. 19.

On May 5, 2017, Mourik filed Defendant's Opposed Expedited Motion to Extend Scheduling Order Deadlines (Docket Entry No. 20), urging the court to extend the dates for filing the joint pretrial order and holding docket call until at least thirty days after resolution of its motion for summary judgment. Mourik's motion acknowledged that Spangler's response to its motion for summary judgment was due on May 17, 2017. On May 16, 2017, Spangler filed Plaintiff's Response to Motion to Extend Scheduling Order Deadlines (Docket Entry No. 21), urging the court to deny Mourik's motion to extend deadlines, arguing that he was prepared to try the case pursuant to the existing deadlines, and that "Mourik is not entitled to a continuance because it waited so long to file its motion [for summary judgment]." On May 16, 2017, the court signed the Proposed Order Granting Defendant's Opposed Expedited Motion to Extend Scheduling Order Deadlines (Docket Entry No. 22), stating that "the Scheduling Order deadlines are terminated and a new Scheduling Order shall be issued, as necessary, following resolution of the Defendant's Motion for Summary Judgment."

`       On May 17, 2017, Spangler filed his response to Mourik's motion for summary judgment and a cross-motion for partial summary judgment seeking summary judgment on Mourik's exemption defenses.[15] Mourik responds that Spangler's cross-motion for partial summary judgment should be denied because it was not timely filed and

---

[15]Plaintiff's Response and CMPSJ, Docket Entry Nos. 23 and 24.

because Spangler has not shown good cause for late filing.[16]
Spangler replies that his cross-motion is timely because the day
before he filed it the court terminated the deadlines in the
Scheduling Order meaning that "there is no dispositive motion
deadline in place."[17]   Spangler also argues that

> [e]ven if the deadline had not been terminated, the Court
> would have been warranted in considering the cross-
> motion, given that (1) the cross-motion arises from the
> same evidence and legal issues as the motion, (2) the
> cross-motion raises no new issues, and (3) Mourik has
> already argued (and the Court has agreed) that there is
> good cause to decide the summary judgment issues before
> trying the case.  Once again, the Court need not reach
> that issue in light of its order terminating the Schedule
> Order deadlines.[18]

"Rule 16(b) provides that once a scheduling order has been
entered, it 'may be modified only for good cause and with the
judge's consent.'"   Marathon Financial Ins., Inc., RRG v. Ford
Motor Co., 591 F.3d 458, 470 (5th Cir. 2009) (quoting Fed. R. Civ.
P. 16(b)(4)).  "The good cause standard requires the 'party seeking
relief to show that the deadlines cannot reasonably be met despite
the diligence of the party needing the extension.'" S&W Enterprises
L.L.C. v. SouthTrust Bank of Alabama, NA, 315 F.3d 533, 535 (5th
Cir. 2003).  Courts consider four factors to determine whether good
cause has been established: "(1) the explanation for the failure to

---

[16]Defendant's Response, Docket Entry No. 27, pp. 5-6.

[17]Plaintiff's Reply, Docket Entry No. 28, p. 1.

[18]Id. at 2.

8

timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." Marathon, 591 F.3d at 470 (quoting Southwestern Bell Telephone Co. v. City of El Paso, 346 F.3d 541, 546 (5th Cir. 2003).

Spangler filed his cross-motion for summary judgment three weeks beyond the due date without moving to amend the Scheduling Order or showing good cause. Spangler's argument that his cross-motion is, in fact, timely because the court had granted Mourik's motion to extend deadlines by terminating the existing deadlines is without merit because the motion the court granted only sought to extend the deadlines that had not already expired, i.e., the deadlines for filing the joint pretrial order and holding docket call. Mourik did not ask and the court did not grant any request to extend deadlines for filing motions for summary judgment. Since, moreover, Spangler has failed either to argue or to show that good causes exists for extending the deadline to file motions for summary judgment, the court concludes that good cause does not exist and that Spangler's cross-motion for summary judgment should be denied as untimely and without good cause. Alternatively, and to avoid further delay, for the reasons explained in the succeeding sections of this Memorandum Opinion and Order, the court concludes that genuine issues of material fact preclude the court from granting summary judgment or partial summary judgment to Mourik or to Spangler.

## B.   Applicable Law: The Fair Labor Standards Act

"The FLSA 'requires an employer to pay overtime compensation to any employee working more than forty hours in a workweek.'" Olibas v. Barclay, 838 F.3d 442, 448 (5th Cir. 2016) (quoting Allen v. Coil Tubing Services, L.L.C., 755 F.3d 279, 282 (5th Cir. 2014) (citing 29 U.S.C. § 207(a)(1))).  Employers who violate the FLSA are liable for "unpaid overtime compensation  .  . and in an additional equal amount as liquidated damages."   29 U.S.C. § 216(b).  Willful violations are subject to a civil penalty not to exceed $1,000.00 per violation.  29 U.S.C. § 216(e)(2).  An FLSA violation "is 'willful' if the employer either knew or showed reckless disregard for . . . whether its conduct was prohibited by the statute."  Singer v. City of Waco, Texas, 324 F.3d 813, 821 (5th Cir. 2003), cert. denied, 124 S. Ct. 1406 (2004).  The plaintiff bears the burden of proving that any violation was willful.  See Samson v. Apollo Restaurant, Inc., 242 F.3d 629, 636 (5th Cir.), cert. denied, 122 S. Ct. 63 (2001) ("Generally, a plaintiff suing under the FLSA carries the burden of proving all elements of his or her claim.").  There are, however, exemptions to the FLSA, which are construed narrowly against the employer, and for which the employer bears the burden of proof.  Olibas, 838 F.3d at 448 (citing Allen, 755 F.3d at 283).   "[T]he ultimate determination of whether an employer qualifies for an exemption under the FLSA is a question of law."  Singer, 324 F.3d at 818. "That ultimate determination, however, relies on many factual determinations that can be resolved by a jury."  Id.

C.   **Application of the Law to the Facts**

   1.   Fact Issues Preclude Granting Either Party Summary
        Judgment as to the Executive Exemption.

   An employee satisfies the executive exemption to the FLSA if

the employee is:

   (1)   Compensated on a salary basis at a rate of not less
         than $455 per week . . .;

   (2)   Whose primary duty is management of the enterprise
         in which the employee is employed or of a
         customarily recognized department or subdivision
         thereof;

   (3)   Who customarily and regularly directs the work of
         two or more other employees; and

   (4)   Who has the authority to hire or fire other
         employees or whose suggestions and recommendations
         as to the hiring, firing, advancement, promotion or
         any other change of status of other employees are
         given particular weight.

29 C.F.R. § 541.100(a).

   Relying primarily on excerpts from Spangler's deposition,

Mourik argues that Spangler satisfies all four elements of the

executive exemption.[19]  Spangler does not dispute that he satisfies

the first three elements of the executive exemption, but argues

that the fourth element "does not apply because [he] had no power

to hire, fire, or make personnel decisions, and because his

recommendations on those matters were given no weight at all."[20]

---

[19]Defendant's FAMSJ, Docket Entry No. 19, pp. 5-18; Defendant's
Reply, Docket Entry No. 26, pp. 3-6.

[20]Plaintiff's Response and CMPSJ, Docket Entry Nos. 23 and 24,
                                                      (continued...)

Citing <u>Rainey v. McWane, Inc.</u>, 552 F.Supp.2d 626, 632 (W.D. Tex. 2008), <u>aff'd</u> 314 F.App'x. 693 (5th Cir. 2009); <u>Gellhaus v. Wal-Mart Stores, Inc.</u>, 769 F.Supp.2d 1071, 1082 (E.D. Tex. 2011); <u>King v. Stevenson Beer Distributing Co.</u>, 11 F.Supp.3d 772, 782-83 (S.D. Tex. 2014); and <u>Carranza v. Red River Oilfield Services, LLC</u>, No. H-15-3631, 2017 WL 387196 (S.D. Tex. January 25, 2017), Mourik replies that "Spangler had greater authority over personnel matters than was present in each of the foregoing cases, and in each of those cases the court granted summary judgment on the executive exemption."[21]

When examining whether an employee's suggestions and recommendations as to the hiring, firing, advancement, or any change of status of other employees are given particular weight, courts consider "whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which such suggestions and recommendations are relied upon." 29 C.F.R. § 541.105. Although the alleged executive does not need to have the authority to make ultimate decisions, "an executive's suggestions and recommendations must pertain to

_____

[20](...continued)
p. 4. <u>See also</u> <u>id.</u> at 5 ("There is no dispute as to the first three elements.").

[21]Defendant's Reply, Docket Entry No. 26, p. 6. <u>See also</u> <u>id.</u> at 3-6.

employees whom the executive customarily and regularly directs."
Id.   Occasional  suggestions  with  regard  to  the  change  of  a
co-worker's status will not qualify.   Id.

The  summary  judgment  evidence  concerning  Spangler's  duties
consists solely of testimony from Spangler and Mourik's Director of
Human Resources, Melissa Barner.[22]   Spangler testified that without
prior approval he had authority to issue a subordinate everything
from "a verbal warning to a write-up or removal . . . [from his]
shift."[23]   Spangler testified that if he thought an employee was
impaired on the job he could recommend that the employee be removed

_____

[22]Spangler objects to Barner's testimony as incompetent opinion
testimony that is not based on personal knowledge.  Spangler argues
that "Ms. Barner does not claim that she worked with or supervised
Mr. Spangler, nor does she claim that she has any knowledge of how
his  recommendations  were  treated  by  his  real  world  managers.
Instead, she simply parrots Mourik's legal position."  Plaintiff's
Response and CMPSJ, Docket Entry Nos. 23 and 24, p. 9.   See also
Plaintiff's Reply, Docket Entry No. 28, pp. 2-3.  Mourik counters
that Barner's Declaration is expressly made on personal knowledge,
her  position  as  Financial  Controller  and  Director  of  Human
Resources, and her knowledge of the duties of various jobs at
Mourik,  including  the  job  held  by  Spangler.    See  Defendant's
Response, Docket Entry No. 27, p. 17 (citing Barner Declaration,
Docket Entry No. 19-2, p. 2 ¶¶ 1-2).   The Fifth Circuit has held
that in the summary judgment context district courts may rely on
affidavits where the affiant's "personal knowledge and competence
to testify are reasonably inferred from their positions and the
nature of their participation in the matters to which they swore."
Direct TV, Inc. v. Budden, 420 F.3d 521, 530 (5th Cir. 2005).
Because Barner's Declaration expressly states that it is based on
personal knowledge, and because Barner's competency to testify is
reasonably  inferred  from  her  position  as  Director  of  Human
Resources,  Spangler's  objection  to  Barner's  testimony  will  be
overruled.

[23]Spangler Deposition, p. 85:9-15, Docket Entry No. 19-2,
p. 23.

13

or tested, and that on one occasion Mourik followed his suggestion
and took a person off of the job for testing,[24] but that when he
removed someone from his shift that person would not be discharged
but, instead, would be reassigned to a different project or shift.[25]
Spangler testified that he "was never involved in the actual hiring
of employees,"[26] and that although he occasionally wrote performance
reviews for members of his crew, he did not know if his reviews
were used to make personnel decisions.[27]   Spangler testified that
on one occasion he suggested that Mourik hire Chris Cotton, the
husband of his brother's ex-wife, and Mourik hired him.[28]

   Barner testified:

   13.   Upon completion of a project, Spangler would work
   out of the Mourik office until the next project. Spangler
   wrote a report summarizing the performance of the Company
   on the project as part of his post-project duties.
   Performance reviews on each of the employees that
   detailed [] each crew member's performance [would be]
   completed by Spangler, and these reviews would be used to
   make decisions regarding promotion and compensation.
   Spangler also completed and approved time sheets for his
   crew at the conclusion of the project.   While in the
   office, Spangler would also work on proposals for
   upcoming projects and related tasks.

   14. Spangler was also responsible for disciplining
   employees on his crew, including everything from "a

---

[24]Id. at 116:14-23, Docket Entry No. 19-2, p. 31.

[25]Id. at 86:11-23, Docket Entry No. 19-2, p. 24.

[26]Id. at 82:22-23, Docket Entry No. 19-2, p. 23.

[27]Id. at 81:11-84:16, Docket Entry No. 19-2, pp. 22-23.

[28]Id. at 111:4-25, Docket Entry No. 19-2, p. 30.

verbal warning to a write-up or removal of the person from my shift." Though Spangler could not unilaterally terminate employees, his suggestions would be given weight by his supervisor and he had occasion to suspend employees from a job for performance issues. Spangler's suggestions or recommendations regarding hiring, were also given weight by his supervisor. For example, Spangler recommended Chris Cotton for hire, and his supervisor gave that recommendation substantial deference such that Cotton was hired.[29]

While undisputed evidence shows that when Spangler worked out of Mourik's office between projects his duties included completion of post-project performance reviews for his crew members, Spangler testified that he only occasionally wrote such performance reviews and did not know if his reviews were used to make decisions regarding hiring, firing, compensating, or changing the employment status of his crew members. Although Barner testified that Spangler's performance reviews were given weight by his supervisor, Mourik has not offered evidence that any of Spangler's written performance reviews were ever used to promote, discharge, or change the employment status of anyone. While there is undisputed evidence that Spangler was allowed to write up employees and/or remove employees from his shift, there is no evidence that Spangler's actions ever lead Mourik to discharge or discipline anyone he directed. The only evidence of any hiring recommendation that Spangler ever made is evidence of a single recommendation to hire Chris Cotton, the husband of Spangler's brother's ex-wife.

---

[29]Barner Declaration, Docket Entry No. 19-1, p. 2.

Although undisputed evidence shows that Mourik hired Cotton, there is no evidence showing the role that Spangler's recommendation played in the decision to hire Cotton. Nor is there any evidence showing that Cotton was hired to work in a position that Spangler directed. Mourik argues that courts have found even a small number of recommendations resulting in hires or promotions sufficient to establish the fourth element of the executive exemption, but the cases that Mourik cites all involved evidence that the plaintiffs' recommendations effected changes in employment status for employees whose work the plaintiffs directed.

In Rainey, 552 F.Supp.2d at 626, the evidence showed that the defendant's human resources department performed initial hiring, but that for the first ninety days of a new employee's employment the plaintiffs were responsible for performing weekly evaluations on each new employee. The evidence also showed that the plaintiffs' evaluations were used to determine which new employees would become permanent and which would be transferred to another department. The evidence also showed that the plaintiffs were could initiate a disciplinary process against employees by filing a request for action with the human resources department, and that the plaintiffs could only remember a few times when the human resources department did not punish an employee after disciplinary action had been requested. The court held the fourth element of the executive exemption was satisfied. Id. at 632.

16

In Gellhaus, 769 F.Supp.2d at 1071, the plaintiff testified that her duties as assistant manager included interviewing, hiring, and "coaching" employees, and that "employee coaching" entailed reviewing an employee's performance. The evidence showed that some of the plaintiff's recommendations regarding hiring and changes in employment status were followed as several of her subordinates received pay raises based in part on her performance reviews. The evidence also showed that the plaintiff disciplined employees by issuing written or verbal warnings, the culmination of which could be discharge. The court held that these facts proved as a matter of law that the defendant gave the plaintiff's recommendations particular weight. Id. at 1081-83.

In King, 11 F.Supp.3d at 772, the parties disputed whether the plaintiff, a team leader, had authority to hire or fire employees. Recognizing that whether the plaintiff had authority to make ultimate employment decisions was not dispositive as long as his recommendations were given particular weight, the court looked to the weight given to the plaintiff's suggestions. Observing that the plaintiff's job description included the ability to write up salesmen for poor rotation, that the plaintiff occasionally asked the operations manager to discipline underperforming employees, and that although the plaintiff's requests to discipline an employee were not always granted, similar requests from other team leaders

were routinely granted, the court concluded that the plaintiff's recommendations were given particular weight. Id. at 783.

In Carranza, 2017 WL 387196, the evidence showed that the plaintiff provided suggestions regarding the hiring, compensation, firing and transfer of crew members, and that his suggestions were usually followed by his manager. The evidence showed that shortly after he was hired, the plaintiff asked to hire two individuals, the defendant granted his request, and the plaintiff later negotiated pay raises for those two individuals.   Moreover, plaintiff could not remember defendant ever having denied his requests either to hire someone for his crew or to raise one of his crew members' pay.  Additional evidence showed that plaintiff had input regarding termination and/or transfer of his crew members including at least one specific individual who was transferred from plaintiff's crew soon after plaintiff complained about him.   The court held that this evidence satisfied the fourth element of the executive exemption. Id. at *4.

Because the evidence in this case regarding the weight that was given to Spangler's recommendations for changes in employment status for people that he directed is substantially less than the evidence before the courts in Rainey, Gellhaus, King, or Carranza, the court concludes that genuine issues of material fact preclude granting summary judgment to either party on this issue.

18

2.   Fact Issues Preclude Granting Either Party Summary
Judgment as to the Administrative Exemption.

An employee satisfies the administrative exemption to the FLSA

if the employee is:

(1)   Compensated on a salary or fee basis at a rate of
not less than $455 per week . . . exclusive of
board, lodging or other facilities;

(2)   Whose primary duty is the performance of office or
non-manual work directly related to the management
or general business operations of the employer or
the employer's customers; and

(3)   Whose primary duty includes the exercise of
discretion and judgment with respect to matters of
significance.

29 C.F.R. § 541.200(a).

Relying primarily on excerpts from Spangler's deposition,

Mourik argues that all three elements for application of the

administrative exemption are satisfied.[30] Spangler does not dispute

that the first element of the administrative exemption is

satisfied, but he argues that the second and third elements are not

applicable, and that he is entitled to summary judgment on this

issue because he "worked in the actual business operations and had

no discretion over matters of importance."[31]

---

[30]Defendant's FAMSJ, Docket Entry No. 19 pp. 7-14; Defendant's
Reply, Docket Entry No. 26, pp. 6-9.

[31]Plaintiff's Response and CMPSJ, Docket Entry Nos. 23 and 24,
p. 5.

> (a) Whether Spangler's Primary Duty Was the Performance of Office or Non-manual Work Directly Related to the General Business Operations of Mourik or Mourik's Customers Is a Fact Issue.

The second element of the administrative employee exemption requires that the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. §§ 541.200(a)(2). Spangler testified that his primary duty was the performance of non-manual work:

> Q. Do you admit that your primary job function was not manual labor at Mourik?
>
> A. I do admit that.[32]

Thus, the issue before the court is whether Spangler's primary duty as a Project Supervisor was directly related to the management or general business operations of Mourik or Mourik's customers. Primary duty means "the principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700(a). "Consistent with the regulations, the Fifth Circuit has held that, as a general rule, an employee's 'primary duty' will typically require over fifty percent of his work time." Cornejo v. Sy Food, Inc., Civil Action No. H-07-2571, 2009 WL 1617074, at *4 (S.D. Tex. April 22, 2009) (citing Lott v. Howard Wilson Chrysler-Plymouth,

---

[32]Spangler Deposition, p. 115:18-20, Docket Entry No. 19-2, p. 31.

Inc., 203 F.3d 326, 331 (5th Cir. 2000)). "However, time is not the
sole parameter to be considered."  Id.

> A non-exhaustive list of factors courts consider when
> determining an employee's primary duty include: (1) "the
> relative importance of the exempt duties as compared with
> other types of duties," (2) "the amount of time spent
> performing exempt work," (3) "the employee's relative
> freedom from direct supervision," and (4) "the
> relationship between the employee's salary and the wages
> paid to other employees for the kind of nonexempt work
> performed by the employee."

Zannikos v. Oil Inspections (U.S.A.), Inc., 605 F. App'x 349, 352

n. 1 (5th Cir. 2015) (citing 29 C.F.R. § 541.700(a)).

> To meet [the "directly related to the management or
> general business operations"] requirement, an employee
> must perform work directly related to assisting with the
> running or servicing of the business, as distinguished,
> for example, from working on a manufacturing production
> line or selling a product in a retail or service
> establishment.

29 C.F.R. § 541.201(a).  The distinction between administrative and

production tasks is not dispositive, but has long been part of the

administrative exemption analysis.  The Fifth Circuit has stated

that "the relevant distinction 'is between those employees whose

primary duty is administering the business affairs of the

enterprise [and] those whose primary duty is producing the

commodity or commodities, whether goods or services, that the

enterprise exists to produce and market."  Dewan v. M-I, L.L.C.,

858 F.3d 331, 336 (5th Cir. 2017) (quoting Dalheim v. KDFW-TV, 918

F.2d 1220, 1230 (5th Cir. 1990)).

21

Citing the district court's opinion in Dewan v. M-I Swaco, No. 2016 WL 695717 (S.D. Tex. February 22, 2016), rev'd, 858 F.3d 331 (5th Cir. 2017), Mourik argues that Spangler's primary duty was directly related to its management and general business operations because "just like the mud engineer in Dewan, Spangler provided consulting services to Mourik's customers, who looked to [him] to provide technical expertise on industrial maintenance and cleaning processes."[33]  Mourik also argues that Spangler's primary duty was directly related to its management and general business operations because Spangler's "work focused on the 'management' of Mourik's business by supervising his crew."[34]  Mourik also cites Gallegos v. Equity Title Company of America, Inc., 484 F.Supp.2d 589, 594 (W.D. Tex. 2007), for that court's statement that "[t]he test of 'directly related to management policies or general business operations' is met by many persons employed as advisory specialists and consultants of various kinds," and Weis v. Advanced Construction Services, Inc., No. 04-52, 2005 WL 2176829 (W.D. Pa. August 19, 2005), report and recommendation adopted, 2005 WL 2403628 (W.D. Pa. September 29, 2005), for its holding that developing construction bids and contracting with subcontractors

---

[33]Defendant's FAMSJ, Docket Entry No. 19 p. 21.

[34]Id.

and suppliers for projects was directly related to the general business operations of the employer construction company.[35]

In Dewan, the District court held that mud engineers who performed no manual work and spent nearly all of their working time continually monitoring the mud for quality control fell within the FLSA's administrative exemption because their duties directly related to the defendant's general business operations in compliance with 29 C.F.R. § 541.201(b), and because the two plaintiffs acted as advisors or consultants to the defendant's customers in compliance with 29 C.F.R. § 541.201(c). Dewan, 2016 WL 695717, at *31. The court held that the mud engineers not only perform non-manual duties, but also were responsible for creating, maintaining, and monitoring the mud product, promoting additional products to customers, and working as on-site consultants, providing independent management of the mud performance. Id. at *22, *31. The mud engineers' duties included consulting with customers by providing "advice and recommendations regarding problems and optimizing the mud system's operations that would then be implemented by production line workers," choosing which "additives to introduce into the mud to attain the desired level of performance, and promoting and selling company products to customers." Id. at *22, *23.

---

[35] Id.

Mourik argues that Spangler's duties are comparable to the duties performed by the mud engineers in <u>Dewan</u>.[36]  But the Fifth Circuit recently reversed the district court's holdings in <u>Dewan</u>. See <u>Dewan</u>, 858 F.3d at 331.[37]  In so doing the Fifth Circuit reasoned:

> It is true that Section 541.201(a) provides that the administrative exemption applies to work relating to the "general business operations" of an employer.  What needs to be kept distinct, though, is that the exemption applies when the employee is involved with "administering the business affairs of the enterprise," not with "producing the commodity" of the business.  <u>Dalheim</u>, 918 F.2d at 1230.  Supplying the drilling-fluid systems seems more related to producing the commodities than the administering of M-I's business.
>
> The district court also found that "nearly all of [the plaintiffs'] working time related directly to continually monitoring the mud for quality control, in compliance with 29 C.F.R. § 541.201(b). . . ."  That section of the regulation identifies functional areas that are directly related to management and includes "quality control" in a list that also contains "areas such as tax; finance; accounting; budgeting; auditing; insurance; . . . purchasing; procurement;" and others. 29 C.F.R. § 541.201(b).  The regulation's reference to "quality control," particularly considering the list of which it is a part, seems to mean the quality of the mud being provided to M-I's customers and not with monitoring and adding materials to the mud as it is being used in drilling wells to ensure that its properties stay within the specifications set forth in the mud plan developed by project engineers.
>
> The district court also determined that the plaintiffs' work as mud engineers was "directly related to the general business operations" because the plaintiffs "acted as advisors or consultants to M-I's

---

[36] <u>Id.</u>

[37] Plaintiff's Supplemental Response, Docket Entry No. 25.

> customers, in compliance with 29 C.F.R. § 541.201(c)."
> That regulation only sets forth two examples of the types
> of employees that may be exempt: tax experts and
> financial consultants. 29 C.F.R. § 541.201(c).

Id. at 336-37. Citing the Ninth Circuit's opinion in Bratt v.

County of Los Angeles, 912 F.2d 1066, 1070 (9th cir. 1990), as

"instructive on the type of work that an exempt advisor or

consultant must perform," id. at 337, the Fifth Circuit explained:

> In determining whether probation officers fit within the
> regulation's concept of advisor, that court held this to
> be the test: "whether the activities are directly related
> to *management policies* or *general* business operations."
> . . . That is, the focus is not on a general concept of
> advice or consultancy but rather on "policy
> determinations [for] how a business should be run or run
> more efficiently. . ." *Id.* Through that lens, the
> probation officers were not clearly "engaged in
> 'servicing' a business within the meaning of" the
> regulations. . .
>
> Further support for this reasoning can be found in
> a 1997 opinion letter issued by the Wage and Hour
> Division of the Department of Labor, which is "entitled
> to respect" to the extent it is persuasive. *See
> Christensen v. Harris County*, 529 U.S. 576, 587, 120
> S. Ct. 1655, 146 L.Ed.2d 621 (2000). In responding to an
> inquiry on whether background investigators fit within
> the FLSA's administrative exemption, the opinion letter
> clarified the type of advice an exempt employee provides:
> the relevant regulation "is directed at advice on matters
> that involve policy determinations, i.e., how a business
> should be run or run more efficiently, not merely
> providing information in the course of the customer's
> daily business operation." U.S. Dep't of Labor, Wage &
> Hour Div., Op. Letter (Sept. 12, 1997). Generally, this
> requires an exempt employee to participate "in important
> staff functions of the employer or the employer's clients
> or customers as opposed to the production functions."

Id. (citations omitted)

Citing its own opinion in <u>Zannikos</u>, 605 Fed. Appx. at 350, as having provided a useful description of "the type of advisory role an exempt employee must perform," <u>id.</u>, the Fifth Circuit explained that in <u>Zannikos</u>

> we held that the plaintiffs' work as marine superintendents fit within this element of the administrative exemption; the employees argued they did not perform non-manual work directly related to the general business operations of the employer's customer. *Id.* at 353. Our analysis required us to be fairly precise about the work:
>
> > The plaintiffs' work, including that relating to line blending, primarily included supervision, quality control, and ensuring compliance with applicable standards. They did not transfer oil, blend oil, or manufacture or sell petroleum products themselves. Instead, they oversaw these functions and provided [the employer's] customers with inspection and operational support services. Such services are not considered production. *Id.*
>
> > We also found that the employees' "primary duties included work in several functional areas explicitly listed as administrative in Section 541.201(b), including quality control, safety, and legal and regulatory compliance." *Id.* Having "concluded that the plaintiffs performed non-manual work directly related to the management of [the employer's] customers," we deemed it "inconsequential" whether they performed the same task "directly related to the management" of their employer. *Id.* at 354.

<u>Id.</u> at 337-38. Applying these principles to the facts of <u>Dewan</u>, the Fifth Circuit held:

> There are significant distinctions between the work performed by these mud engineers [at issue in *Dewan*] and the *Zannikos* marine superintendents. The latter oversaw the work performed by the customers' employees, contractors, and equipment. *Id.* at 351. Mud engineers, on the other hand, neither assured compliance with health and safety standards nor engaged in tasks likely to

26

qualify as the "general administrative work applicable to the running of any business." *See Davis*, 587 F.3d at 535. "[W]ork that [i]s primarily functional rather than conceptual" does not meet the standard. *See id.* We conclude that the district court erred in granting summary judgment on the issue of whether the plaintiffs' work could be classified as . . . work directly related to the general business operations of M-I's customers.

Id. at 338.

As evidence that Spangler provided consulting services to its customers, Mourik merely analogizes Spangler's duties to the duties performed by the mud engineers in Dewan.[38] Mourik does not cite any evidence showing that Spangler provided services related to tax or financial consulting, the only two examples of exempt consulting identified in the regulations, 29 C.F.R. § 541.201(c). See Dewan, 858 F.3d at 336-37. Nor does Mourik cite any evidence showing what — if any — "consulting services" or "technical expertise on industrial maintenance and cleaning processes," Spangler provided to Mourik's customers that involved policy matters, i.e., "how a business should be run or run more efficiently, not merely providing information in the course of the customer's daily business operation." See id. at 337.

As evidence that Spangler's "work focused on the 'management' of Mourik's business by supervising his crew," Mourik cites only the testimony provided by Barner and Spangler describing Spangler's typical work day and duties. See § II, above. This evidence shows

---

[38]Defendant's FAMSJ, Docket Entry No. 19 p. 21.

that Spangler began his workdays by meeting with the client before his shift to discuss planned tasks, that Spangler's meeting with the client was followed by a meeting with his crew to discuss the tasks to be completed during their shift and to assign personnel to various tasks, and that Spangler spent the rest of his day monitoring the crew's work via video feed to his computer.[39] Spangler used his observations to direct the crew through the shift, allocate resources to accomplish goals, and keep time sheets.[40]   Spangler argues that this evidence shows that his "primary duty involved the actual, ongoing business operations of the company, not general business operations such as accounting or human resources."[41]

The regulations explain that "[w]ork directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee

---

[39]Id. at 9 (citing Barner Declaration, Docket Entry No. 19-1, pp. 4-5 ¶10, and Spangler Deposition, pp. 88:20-89:3, 90:9-22, Docket Entry No. 19-2, pp. 24-25).

[40]Id. at 9-10 ((citing Barner Declaration, Docket Entry No. 19-1, p. 5 ¶11, and Spangler Deposition, pp. 88:4-6, 94:12-97:18, Docket Entry No. 19-2, pp. 24 and 26).

[41]Plaintiff's Response and CMPSJ, Docket Entry Nos. 23 and 24, p. 15.

benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities." 29 C.F.R. § 541.201(b). Spangler's duties do not fall neatly into any of these categories. And, even as Mourik describes them, most of Spangler's duties appear related to producing the services that Mourik offers and sells to its customers, i.e, factory turnaround and industrial cleaning services performed by Mourik employees at customers' sites,[42] not management or general business operations of either Mourik or Mourik's customers. For example, the undisputed evidence shows that Spangler supervised crews that varied in size from two to thirty employees, but that Mourik typically deployed two crews to each project, the two crews worked different shifts, Spangler supervised only one of the two shifts and reported to a Project Manager.[43] There is also evidence, however, that Spangler was the highest level employee onsite, suggesting that his duties could have be more administrative than productive in nature,[44] and that Spangler's job duties included preparing time sheets for his crew members and proposals for new

---

[42]See Barner Declaration, Docket Entry No. 19-1, p. 5 ¶11, and Spangler Deposition, pp. 88:4-6, 94:12-97:18, Docket Entry No. 19-2, pp. 24 and 26

[43]See Barner Declaration, Docket Entry No. 19-1, p. 5 ¶11, and Spangler Deposition, pp. 88:4-6, 94:12-97:18, Docket Entry No. 19-2, pp. 24 and 26

[44]Barner Declaration, Docket Entry No. 19-1, p. 5 ¶12.

projects,[45] tasks that arguably constitute exempt work. See Weis, 2005 WL 2176829, *3-*4. Missing from the summary judgment record, however, is evidence showing the relative importance of Spangler's non-exempt duties as compared to his exempt duties, the amount of time that Spangler spent performing exempt duties, Spangler's relative freedom from direct supervision, and the relationship between Spangler's salary and the wages paid to other employees for the kind of non-exempt work that Spangler performed. See Zannikos, 605 F. App'x at 352 n. 1 (citing 29 C.F.R. § 541.700(a)). Absent such evidence genuine issues of material fact regarding Spangler's primary duties preclude the court from granting summary judgment to either party on the second element of the administrative exemption.

> (b) Whether Spangler's Primary Duty Included Exercise of Discretion and Independent Judgment with Respect to Matters of Significance Is a Fact Issue

The final requirement for an employer to properly classify an employee as an exempt administrative employee is that the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. §§ 541.200(a)(3). See also 29 C.F.R. § 541.202(a). "The term 'matters of significance' refers to the level of importance or consequence of the work performed." 29 C.F.R. § 541.202(a).

---

[45]Id. at ¶13. See also Spangler Deposition, pp. 84:7-11, 99:14-100:23, 104:4-105:14, Docket Entry No. 19-2, pp. 23, 27, 28.

Factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance include, but are not limited to: (1) "whether the employee has authority to formulate, affect, interpret, or implement management policies or operating practices;" (2) "whether the employee carries out major assignments in conducting the operations of the business;" (3) "whether the employee performs work that affects business operations to a substantial degree, even if the employee's assignments are related to operation of a particular segment of the business;" (4) "whether the employee has authority to commit the employer in matters that have significant financial impact;" (5) "whether the employee has authority to waive or deviate from established policies and procedures without prior approval;" (6) "whether the employee has authority to negotiate and bind the company on significant matters;" (7) "whether the employee provides consultation or expert advice to management;" (8) "whether the employee is involved in planning long- or short-term business objectives;" (9) "whether the employee investigates and resolves matters of significance on behalf of management;" and (10) "whether the employee represents the company in handling complaints, arbitrating disputes or resolving grievances." 29 C.F.R. § 541.202(b).

The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free

31

from immediate direction or supervision." 29 C.F.R. § 541.202(c).
Nevertheless, the term "discretion and independent judgment" as
used in the regulations "does not require that the decisions made
by an employee have a finality that goes with unlimited authority
and a complete absence of review." Id. Indeed, the decisions made
by the employee may merely lead to recommendations for further
action. Id. The fact that an employee's decisions are subject to
review, and that they may be reversed or rejected, does not mean
that the employee is not exercising discretion and independent
judgment. Id. The interpretive regulations emphasize that the
exercise of discretion and independent judgment must be more than
the use of skill in applying well-established techniques,
procedures, or specific standards described in manuals or other
sources. 29 C.F.R. § 541.202(e). "The exercise of discretion and
independent judgment . . . does not include clerical or secretarial
work, recording or tabulating data, or performing other mechanical,
repetitive, recurrent or routine work." Id.

As evidence that Spangler's primary duty satisfy the third
element of the administrative exemption, Mourik asserts Spangler
"admits that his job required the exercise of discretion and
judgment on matters of significance."[46] Mourik also asserts that

---

[46]Defendant's FAMSJ, Docket Entry No. 19, p. 23 (citing
Spangler Deposition, pp. 106:2-10, 115:24-117:24, Docket Entry
No. 19-2, pp. 29 and 31; and Barner Declaration, Docket Entry
No. 19-1, p. 5 ¶11).

> [b]]eyond [his] admission, Spangler testified that his
> job required that he develop proposals or bids for large-
> scale refinery turnarounds, plan how to allocate
> resources and personnel to safely perform dangerous
> cleaning and maintenance work in toxic environments, and
> problem solve unforeseen challenges during the provision
> of such services.[47]

Citing Weis, 2005 WL 2176829, and Dewan, 858 F.3d 331, Mourik

argues that the work Spangler performed "exceed[ed] the discretion

and judgment [evidenced in these cases]; and satisfies the

administrative exemption as a matter of law."[48]

Spangler responds that Mourik's assertion he admitted that his

job required the exercise of discretion and judgment on matters of

significance is incorrect and that he has, instead, testified that

"he had no discretion at all."[49]   Spangler argues that Mourik's

contention that he performed a variety of discretionary tasks,

> chooses not to focus on Mr. Spangler's primary duties.
> For example, Mourik claims that Mr. Spangler "testified
> that his job required that he develop proposals or bids
> for large-scale refinery turnarounds." Motion at 19.
> Mr. Spangler's actual testimony was quite different, in
> that this was a small percentage of his work, as opposed
> to his primary duty. . . The small amount of time that
> Mr. Spangler spent on bids is significant because, even
> if that work might otherwise qualify for the

---

[47]Id. (citing Spangler Deposition, pp. 48:5-22, 74:1-75:20,
88:20-89:8, 90:9-22, 93:3-23, 94:24-95:22, 96:10-23, 99:14-22,
100:18-23, 103:4-105:14, Docket Entry No. 19-2, pp. 14, 21, 24-28;
and Barner Declaration, Docket Entry No. 19-1, pp. 3-4 ¶7). See
also Defendant's Reply, Docket Entry No. 26, pp. 7-8.

[48]Id. at 23-24.

[49]Plaintiff's Response and CMPSJ, Docket Entry Nos. 23 and 24,
p. 16 (citing Spangler Deposition, p. 222:2-20, Docket Entry
No. 19-2, p. 58).

Administrative   Employee   exemption,   <u>it   was   not</u>
<u>Mr. Spangler's primary duty.</u>[50]

Citing the factors listed in 29 C.F.R. § 541.202(b), Spangler argues that he did not perform any of the discretionary duties listed, and concludes that his "duties do not even come close to satisfying the second and third elements of the Administrative Employee exemption."[51]   Citing Spangler's job description, Mourik argues in reply that the tasks Spangler performed "epitomize the exercise of discretion and judgment and support summary judgment."[52]

In <u>Weis</u>, 2005 WL 2176829, *3-*4, the court held as a matter of law that preparing estimates used to bid on projects and to contract subcontractors and suppliers were duties "directly related" to the defendant's general business operations of providing construction services, and that the plaintiff who performed these duties was subject to the administrative exemption. But in that case its was undisputed that preparing estimates and contracting with subcontractors and suppliers were the plaintiff's primary job duties.   Here, Spangler testified that he spent only ten to fifteen percent of his time preparing proposals for new

---

[50]<u>Id.</u> at 16-17 (citing Spangler Deposition, pp. 222:22-223:16, Docket Entry No. 19-2, p. 58).

[51]<u>Id.</u> at 17-18.

[52]Defendant's Reply, Docket Entry No. 26, p. 9 (citing Spangler's Deposition, pp. 74:1-76:14, Docket Entry No. 19-2, p. 21.

projects,[53] and Barner testified that Spangler worked on proposals for new projects when he worked out of Mourik's office between projects.[54]   Whether Spangler's primary job duties were exempt or non-exempt duties is a question of fact for trial.

In <u>Dewan</u>, the district court concluded that the matter of significance over which the plaintiffs exercised the requisite discretion and independent judgment was the "quality control of the condition of the mud. . ."  858 F.3d at 338-39.  The district court determined that the plaintiff's primary duty "involved first determining the condition of the mud in various locations admittedly through a variety of fairly standard tests," and then deciding "which of various additives and treatments of the mud or what tradeoffs would optimize drilling performance. . ."  <u>Id.</u> at 339.   The court reasoned that the engineers evaluated alternate courses of action and thereby satisfied the need for exercising discretion and independent judgment.   <u>Id.</u> (citing 29 C.F.R. § 541.202(a)).  The district court also found that the plaintiffs' work affected the defendant's operating procedures because they could deviate from standard operating procedures, and they acted with limited supervision.   <u>Id.</u>   The Fifth Circuit, however, concluded that a reasonable jury could credit the plaintiffs'

---

[53]Spangler Deposition, pp. 222:22-223:14, Docket Entry No. 19-2, pp. 57-58.

[54]Barner Declaration, Docket Entry No. 19-1, p.5 ¶13.

testimony that they exercised no discretion and merely applied well-established techniques, procedures, or specific standards described in manuals or other sources, and that the limited factual record could reasonably be interpreted to provide two different understandings of the scope of the plaintiffs' discretionary authority and independent judgment. Id. at 339-40. The Fifth Circuit also pointed out that "[t]o the extend the testimony of a witness who is also a party may be impaired by party self-interest, it is ordinarily the role of the jury — not the court on summary judgment." Id. at 340 (quoting Johnson v. Perez, 823 F.3d 701, 710 (D.C. Cir. 2016).

The evidence on which both parties rely is not sufficient to find as a matter of law that Spangler's primary duties either involved or did not involve the exercise discretion and independent judgment with respect to matters of significance. The questions and answers on which both parties rely are largely conclusory and devoid of details needed to understand either the scope of Spangler's primary duties, or the degree of discretion and independent judgment that he exercised with respect to matters of significance on a regular basis. As the Fifth Circuit concluded in Dewan, 858 F.3d at 339-40, the limited factual record could reasonably be interpreted to provide two different understandings of the scope of the plaintiff's discretionary authority and independent judgment. Accordingly, as stated in §III.C.2(a),

above, with respect to the second element of the administrative exemption, genuine issues of material fact regarding Spangler's primary duties preclude the court from granting summary judgment to either party on the third element of the administrative exemption.

### 3.  Fact Issues Preclude Granting Either Party Summary Judgment as to the Combination Exemption.

Mourik argues that it is entitled to summary judgment on plaintiff's claim for unpaid overtime and statutory damages because an employee who performs a combination of exempt duties — but who does not satisfy the primary duty requirement under any of the stand-alone exemptions — may nevertheless qualify for exempt status.  29 C.F.R. § 541.708 ("[A]n employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption so long as the other requirements, such as the salary basis test, are met.").  Mourik argues that "[p]laintiff performed duties consistent with both the executive and administrative exemptions.  However, in the event that the [c]ourt concludes that one element of the respective duties test is not met, the combination exemption still applies."[55] Quoting Villegas v. Dependable Construction Services, Inc., No. 4:07-cv-2165, 2008 WL 5137321 (S.D. Texas December 8, 2008), Spangler argues that the court should deny Mourik's motion on this

---

[55]Defendant's FAMSJ, Docket Entry No. 19, p. 24.  See also Defendant's Reply, Docket Entry No. 26, pp. 9-10.

Case 4:16-cv-00349 Document 29 Filed in TXSD on 08/08/17 Page 38 of 46

point because "[w]here, as here, it is not clear that . . . [the employee] had exempt work, under either category, as their primary duty, the combination exemption cannot apply."[56]

In pertinent part the Department of Labor regulations provide:

Employees who perform a combination of exempt duties as set forth in the regulations in this part for executive [and] administrative . . . employees may qualify for exemption. Thus, for example, an employee whose primary duty involves a combination of exempt administrative and exempt executive work may qualify for exemption. In other words, work that is exempt under one section of this part will not defeat the exemption under any other section.

29 C.F.R. § 541.708. For the reasons set forth in the preceding two sections the court has already concluded that genuine issues of material fact regarding Spangler's primary duties preclude the court from granting summary judgment to either party on the executive or the administrative exemption. Because the application of the combination exemption similarly turns on questions of what, if any, exempt duties, Spangler performed, the court concludes that the fact issues that preclude the court from granting either party summary judgment on the executive or administrative exemption also preclude the court from granting summary judgment to either party on the combination exemption.

---

[56]Plaintiff's Response and CMPSJ, Docket Entry Nos. 23 and 24, p. 19.

4.   <u>Fact Issues Preclude Granting Either Party Summary Judgment as to the Motor Carrier Exemption.</u>

The Motor Carrier Act ("MCA") exemption to the FLSA's overtime provisions states, in relevant part, that the FLSA's overtime requirement "shall not apply with respect to — (1) any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." 29 U.S.C. § 213(b)(1).   The MCA exemption applies to employees who are (1) employed by a motor carrier or private carrier, as defined by 49 U.S.C. § 13102, and (2) engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on public highways of passengers or property in interstate or foreign commerce within the meaning of the MCA. 29 C.F.R. § 782.2(a).   Activities affecting the safety of motor vehicles are included in the work of drivers, driver's helpers, loaders, or mechanics. 29 C.F.R. § 782.2(b)(1) (citing <u>Levinson v. Spector Motor Serv.</u>, 67 S. Ct. 931, 946, (1947)).   A driver is an individual who drives a motor vehicle in transportation in interstate or foreign commerce, including employees with partial duties as drivers and other nondriving work.  29 C.F.R. § 782.3. <u>See also</u> 29 C.F.R. §§ 782.3-782.6 (defining "drivers," "drivers' helpers," "loaders," and "mechanics").  The general rule is that:

> if the bona fide duties of the job performed by the
> employee are in fact such that he is (or, in the case of
> a member of a group of drivers, driver's helpers,

> loaders, or mechanics employed by a common carrier and engaged in safety-affecting occupations, that he is likely to be) called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities . . . he comes within the exemption in all workweeks when he is employed at such job. . . Where this is the case, the rule applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting "safety of operation."

Allen, 755 F.3d at 284 (quoting 29 C.F.R. § 782.2(b)(3)). "On the other hand, where the continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, and insignificant as to be de minimis, the exemption will not apply to [the employee] in any workweek so long as there is no change in his duties." Id. (quoting 29 C.F.R. — 782.2(b)(3) (citing Pyramid Motor Freight Corp. v. Ispass, 67 S. Ct. 954, 960 (1947)).

In 2008, however, Congress passed the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU") Technical Corrections Act of 2008 ("TCA"), Pub.L. 110-244, 122 Stat. 1572, which, in part, provides generally that, from June 6, 2008, the MCA exemption does not apply to employees who would otherwise fall within its ambit if the following requirements are met:

> (1)   [the employee] is employed by a motor carrier or motor private carrier (as such terms are defined by section 13102 of title 49, United States Code, as amended by section 305);

(2)    [the employee's] work, in whole or in part, is defined—

    (A)    as that of a driver, driver's helper, loader, or mechanic; and

    B)    as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce . . .; and

(3)    who performs duties on motor vehicles weighing 10,000 pounds or less.

SAFETEA-LU Technical Corrections Act of 2008, Pub.L. No. 110-244, §§ 305-06, 122 Stat. 1572, 160-21 (June 6, 2008). See McCall v. Disabled American Veterans, 723 F.3d 962, 964 (8th Cir. 2013).

Ordinarily, it is the plaintiff's burden to establish that he or she is covered by the FLSA, and it is the defendant's burden to establish that an FLSA exemption applies. See Samson, 242 F.3d at 636 (stating that in general plaintiffs bear the burden of proving coverage by the FLSA); Olibas, 838 F.3d at 448 (stating that employers generally bear the burden of establishing an exemption to the FLSA). Citing Garcia v. Western Waste Services, Inc., 969 F.Supp. 2d 1252, 1261 (D. Idaho 2013), Mourik argues therefore, that while it bears the burden of establishing the applicability of the MCA, Spangler bears the burden of establishing the applicability of the TCA exception as part of the requirement that he prove he is covered by the FLSA.[57]

---

[57]Defendant's Reply, Docket Entry No. 26, p. 10.

Asserting that Spangler testified that he drove vehicles in excess of 10,000 pounds across state lines for Mourik and that he knew he could be called upon to do so at any time, Mourik argues that Spangler was subject to the MCA exemption.[58] Anticipating that Spangler might argue that he was not subject to the MCA exemption because driving was just a small part of his job, Mourik cites Alexander v. Tutle & Tutle Trucking, Inc., 834 F.3d 866, 870 (8th Cir. 2016), for its holding that employees who delivered oilfield equipment and supplies to well sites who claimed that less than 1% of their driving duties took them across state lines were nevertheless subject to the MCA exemption.[59]

Without addressing where the burden of proof lies, Spangler argues that he is subject to the TCA exception to the MCA exemption because he has offered uncontradicted testimony that his primary work vehicle was a truck weighing less than 10,000 pounds.[60] Mourik replies that because Spangler "offers no evidence that his 'work, in whole or in part' involved the use of driving his pickup[, h]e simply states that his work truck was his pickup and that his pickup weighed less than 10,000 pound,"[61] Spangler "fails to meet

---

[58]Defendant's FAMSJ, Docket Entry Nos. 23 and 24, p. 26.

[59]Id.

[60]Plaintiff's Response and CMPSJ, Docket Entry Nos. 23 and 24, pp. 19-20; Plaintiff's Reply, Docket Entry No. 28, p. 5.

[61]Defendant's Reply, Docket Entry No. 26, p. 11.

*Plaintiff's* burden that his work was 'in whole or in part' the use of his pickup."[62] In addition, Mourik argues that

> even if considered work, the driving of a pickup does not satisfy the third prong of the TCA — the duties requirement. Notably, unlike the second element which concerns "<u>work</u> in whole or in part," the third element concerning <u>duties</u> is not qualified with the language "in whole or in part." As a result, the TCA cannot be applied to an employee unless the employee performs "duties" on non-commercial vehicles. Here, Plaintiff offers no evidence that his duties were operating a pickup. Given the absence of evidence, Plaintiff fails to meet his burden to show that he came within the TCA exception to the MCA.[63]

The parties do not dispute that the first elements of the TCA exception are satisfied, i.e., the parties agree that Mourik is a motor private carrier,[64] and that Spangler's work required him to engage in activities that directly affected the safe operation of motor vehicles in interstate transportation.[65] The parties contest the applicability of the third element, whether Spangler performed duties on motor vehicles weighing 10,000 pounds or less.

---

[62]<u>Id.</u>

[63]<u>Id.</u>

[64]<u>See</u> Defendant's FAMSJ, Docket Entry No. 19, p. 25; Plaintiff's Response and CMPSJ, Docket Entry Nos. 23 and 24, pp. 19-20.

[65]<u>See</u> Defendant's FAMSJ, Docket Entry No. 19, pp. 25-26 (citing Spangler's Deposition, pp. 57:15-58:8, Docket Entry No. 19-2, pp. 16-17 (acknowledging that he had a commercial drivers license and that he drove equipment for Mourik across state lines); Plaintiff's Response and CMPSJ, Docket Entry Nos. 23 and 24, p. 19.

Mourik argues that any work on larger vehicles disqualifies Spangler from the FLSA's overtime mandate.   A similar argument was considered and rejected in Aikins v. Warrior Energy Services Corp., No. 6:13-CV-54, 2015 WL 1221255 (S.D. Tex. March 17, 2015).   In relevant part, that court stated:

> Given the language of section 306(c)(2), which states that a covered employee's work need only "in part" affect the safety of vehicles weighing 10,000 pounds or less, it is unsurprising that few courts have held that any substantial work on larger vehicles disqualifies an employee from the FLSA's overtime mandate. . . A more plausible reading is that, in order to be owed overtime notwithstanding the MCA, an employee must both (1) perform some work that "affect[s] the safety of operation of" smaller vehicles, and (2) it must be part of the employee's "duties" to do so.   The "duties" element may prevent de minimis or aberrational activities outside the scope of an employees' routine duties from qualifying an employee for TCA coverage.   It does not state or imply, however, that covered employees cannot also have substantial duties involving larger vehicles. The Department of Labor has endorsed this view, noting in a guidance document that even in weeks where employees worked on vehicles weighing more than 10,000 pounds (and thus were subject to Department of Transportation regulations), those employees would still be entitled to overtime if they worked on vehicles weighing less than 10,000 pounds. Hernandez v. Alpine Logistics, LLC, 2011 WL 3800031, at *5 (W.D.N.Y. Aug. 29, 2011) (discussing Department of Labor, Wage & Hour Division, Fact Sheet # 19 (Nov. 2009), available at http://www.dol.gov/whd/regs/compliance/whdfs19.pdf).
>
> The Court thus follows the majority of courts (including the only court of appeals) to have addressed the issue, and declines to adopt a reading of the TCA that any significant use of vehicles weighing more than 10,000 pounds excludes an employee from FLSA coverage. See, e.g., [McMaster v. E. Armored Services, Inc., 780 F.3d 167, 170, fn. 4 (3d Cir. 2015)](holding that a driver who "spent 51% of her total days working on vehicles rated heavier than 10,000 pounds, and 49% of her total days working on vehicles rated lighter than 10,000 pounds"

fell "squarely within the [TCA's] definition of a 'covered employee'") . . . ; Allen[ v. Coil Tubing Services, L.L.C., 846 F.Supp.2d 678,] 705 [S.D. Texas January 11, 2012), aff'd 755 F.3d at 279] (finding fact issue where parties did not provide sufficient evidence concerning the plaintiffs' "use (or non-use) of noncommercial vehicles"). Because the TCA extends FLSA coverage to motor carrier employees whose work, even "in part," "affect[s] the safety of operation of motor vehicles weighing 10,000 pounds or less," the law does not exclude a motor carrier employee from FLSA coverage merely because his or her work also involves operating heavier vehicles.

Aikins, 2015 WL 1221255, at *5.

The Court agrees with the reasoning and analysis in Aikins and accordingly is not persuaded that Mourik is entitled to summary judgment that the MCA exemption applied to Spangler simply because Spangler testified that he drove vehicles across state lines for Mourik that weighed in excess of 10,000 pounds, and knew that he could be called upon to do so at any time. The court is similarly unpersuaded by Mourik's argument that Spangler bears the burden of proof on applicability of the TCA exception to the MCA exemption. To establish entitlement to summary judgment, an employer must provide evidence either that its employees exclusively drove vehicles greater than 10,000 pounds during a relevant workweek, or that any work with smaller vehicles was merely de minimis work. See Roche v. S-3 Pump Service, Inc., 154 F. Supp. 3d 441, 448–449 (W.D. Tex. 2016) ("Given the [ ] 'in whole or in part' language, it is the employer's burden to demonstrate that the employees exclusively drove vehicles greater than 10,000 pounds during a

workweek."). Since, however, Spangler has not presented any evidence showing either that Mourik required him to drive vehicles that weighed less than 10,000 pounds or that such driving was more than a de minimis part of his work, Spangler has not presented evidence sufficient to establish that he is entitled to summary judgment on this issue.

## IV. Conclusions and Order

For the reasons stated in fn. 22, above, Spangler's objections to the Barner Declaration are **OVERRULED**. For the reasons stated in § III.A, above, Plaintiff's Cross-Motion for Partial Summary Judgment, Docket Entry Nos. 23 and 24, are **DENIED**. For the reasons stated in § III.C., above, Defendant's First Amended Motion for Complete Summary Judgment, Docket Entry No. 19, is **DENIED**.

The Joint Pre-Trial Order is due on September 1, 2017. Docket Call will be held at 3:00 p.m. on September 8, 2017.

**SIGNED** at Houston, Texas, this 8th day of August, 2017.

SIM LAKE
UNITED STATES DISTRICT JUDGE